In re MIDLANDS UTILITY,
INC., Debtor.

No. 94–72521–W–W.

United States Bankruptcy Court,
D. South Carolina.

Sept. 27, 2000.

Frank Rogers Ellerbe, III, Columbia, SC, William F. Halligan, Lydia A. Eloff, Robinson, McFadden, Moore, PC, Columbia, SC, for Debtor.

## ORDER

JOHN E. WAITES, Bankruptcy Judge.

Based upon the Findings of Fact and Conclusions of Law as recited in the attached Order of the Court, Midlands Utility, Inc.'s Motion to Amend Order of Confirmation Pursuant to Bankruptcy Rule 9024 is denied.

## ORDER

THIS MATTER comes before the Court upon Midlands Utility, Inc.'s ("Debtor") Motion to Amend Order of Confirmation Pursuant to Bankruptcy Rule 9024 (the "Motion"), filed with the Court on May 5, 2000. Debtor seeks relief from a specific provision of the Order of Confirmation, entered by the Court on February 1, 1995, on the grounds that it is no longer equitable that the provision should have prospective application. The specific relief requested is that the Court modify the Order of Confirmation, and more specifically the Attachment to Confirmation Order (the "Attachment"), to eliminate the minimum utility rate provisions which bind the Debtor and the City of Cayce in any future arbitration proceeding. The City of Cayce filed an Objection to Debtor's Motion to Amend Confirmation Order (the "Objection") on the grounds that there has not been a sufficient change of circumstances, either factual or in the applicable law, which justifies modification of the Order. After considering the pleadings, the arguments of counsel at the hearing on the

Motion, and the evidence introduced, the Court makes the following Findings of Fact and Conclusions of Law pursuant to Fed.R.Civ.P. 52, made applicable in bankruptcy proceedings by Fed.R.Bankr.P. 7052.[1]

## FINDINGS OF FACT

1. Debtor is a regulated utility company which provides sewer service to certain specified geographical areas in the midlands of South Carolina. The rates that Debtor may charge to its customers are regulated by the South Carolina Public Service Commission (the "PSC"). Debtor is also regulated by the South Carolina Department of Health and Environmental Control ("DHEC").

2. Pursuant to the federal Clean Water Act and regulations promulgated under the Act, Debtor was required to close a number of its sewage treatment facilities and to interconnect with larger regional treatment facilities. One of the regional treatment facilities with which Debtor has connected is operated by the City of Cayce.

3. Debtor originally filed for relief under Chapter 11 of the Bankruptcy Code on May 26, 1994. Debtor's contractual relationship with the City of Cayce was a central focus of its Chapter 11 filing. The confirmed Plan, in fact, provided for repayment by Debtor to the City of Cayce of $158,479.00 in debts arising from tap fees which the City of Cayce had financed for several years prior to the bankruptcy filing.

4. On August 23, 1994, Debtor filed its first proposed Disclosure Statement and Plan of Reorganization; however, on October 13, 1994, the City of Cayce filed an Objection to Plan of Reorganization.

5. Debtor filed its First Plan Modification on October 28, 1994, followed by a

---

1. The Court notes that to the extent any of the following Findings of Fact constitute Conclusions of Law, they are adopted as such, and to the extent any Conclusions of Law constitute Findings of Fact, they are so adopted.

Second Plan Modification filed on November 7, 1994.

6. It was not until February 1, 1995 that the Confirmation Order was entered. The Confirmation Order was supplemented by the Attachment which resolved the objections of the City of Cayce and DHEC.[2]

7. The Attachment was the result of a negotiated agreement among Debtor, the City of Cayce, and DHEC.

8. The Order of Confirmation contained provisions which control the continuing relationship between Debtor and the City of Cayce regarding the latter's treatment of waste generated by Debtor's customers. In particular, Section 4 of the Attachment to the Order of Confirmation includes a series of provisions regarding this continuing contractual relationship. Section 6.03 of the Attachment provides that, for a period of two years not to extend beyond December 31, 1996, the City of Cayce would charge Debtor a measured treatment rate equal to the City of Cayce's "Inside Sewer Customer" rate. The Attachment also provides, under Section 6.06, that for a period of three years after the initial period, the City of Cayce would charge Debtor "150% (one hundred fifty percent) of the then current rate for an 'Inside Sewer Customer.'" The three-year period specified in Section 6.06 was not to extend beyond December 31, 1999. Finally, Section 6.08 of the Attachment provides:

> Following the three year period detailed in Section 6.06 above, the City of Cayce and the Reorganized Debtor will negotiate in good faith the terms of an agreement governing the rates to be charged for treatment of sewage waste water. If the parties are unable to reach an agreement in this regard, the issue of the

sewage treatment rate and whether there is reasonable justification for the treatment rate to be increased from 150% of the Inside Sewer Customer rate shall be subject to binding arbitration between the parties. Such arbitration shall be governed by the rules and regulations of the American Arbitration Association. However, the decision by the arbitration panel governing the sewage treatment rate shall not extend beyond an additional five year period *and in no event after December 31, 2004, and the arbitrated rate shall not be less than 150% of the Inside Sewer Customer rate unless the City of Cayce specifically agrees otherwise.* These conditions are specific limitations on any arbitration, if such arbitration becomes necessary. Nothing in this paragraph obligates the City of Cayce in any manner whatsoever to allow additional sewer taps to be added to the system of the Reorganized Debtor or the City of Cayce other than the obligation of the City of Cayce to negotiate in good faith with the Reorganized Debtor pursuant to paragraph 6.07 above.

(Emphasis added).

9. The City of Cayce and Debtor have not been able to negotiate a new wastewater treatment contract within the parameter of Section 6.08 of the Attachment for the five year period beginning January 1, 2000 through December 31, 2004. While Debtor is willing to proceed to arbitration with the City of Cayce on a new sewer treatment rate, it believes that it is no longer equitable that it be barred from seeking a rate lower than 150% of the Inside Sewer Customer rate.

10. Debtor met its obligations to other creditors under the Plan; and, on September 22, 1995, Debtor filed its Application

---

**2.** The Order of Confirmation provided:
IT IS ORDERED that the plan filed by the debtor August 23, 1994, and modified by the First Modification filed October 28, 1994, and the Second Modification filed November 7, 1994, hereby is confirmed, pursuant to this Order and the Attachment hereto which resolves the objections of the City of Cayce and the South Carolina Department of Health and Environmental Control:

for Final Decree, Final Report and Certification of Substantial Consummation. A Final Decree and Order Closing Case was entered on January 4, 1996.

11. Subsequent to the entry of the Order of Confirmation, the City of Cayce entered into two other Wholesale Sewer Treatment Agreements by which it has agreed to provide treatment services at rates below the 150% of the Inside Sewer Customer rate which it currently charges Debtor. On April 11, 1995, the City of Cayce entered into a contract with Lexington County Joint Municipal Water and Sewer System. On June 20, 1996, the City of Cayce also entered into a contract with the Town of Lexington (collectively "Lexington Contracts"). The actual treatment rate charged in these agreements is contained in a formula, which Debtor believes produces a rate of $.61 per thousand gallons of waste, compared to the $2.20 per thousand gallons presently charged to Debtor. As a result, Debtor argues that members of the public served by it pay a higher charge for such services than do their neighbors who are served by different entities who have contracted with the City of Cayce.

12. Prior to filing the Motion presently before this Court; on December 30, 1999, Debtor filed a Motion to Reopen Case and to Waive Filing Fee. On February 3, 2000, the Court entered an Order denying Debtor's request to waive payment of the reopening fee, and the fee was paid on that same date. Subsequently, on May 2, 2000, the Court entered an Order granting Debtor's Motion to Reopen Case for the purpose of considering this Motion.

## CONCLUSIONS OF LAW

Debtor moves to amend prospectively the Order of Confirmation entered on February 1, 1995 on the grounds that the provisions of that Order, relating to the minimum rate to be charged to Debtor by the City of Cayce, are no longer equitable in light of the subsequent contracts that the City of Cayce has entered into. Debtor argues that it is entitled to a rate comparable to that charged by the City of Cayce for other wholesale sewage treatment customers and further asserts that if the Motion were granted, Debtor would then have the ability to undergo arbitration to seek such a comparable rate. Debtor seeks an amendment of the Order of Confirmation pursuant to Fed. R.Bankr.P. 9024, which incorporates Fed. R.Civ.P. 60(b). More specifically, Debtor seeks to amend provisions in the Attachment, which was incorporated by reference in the Order of Confirmation, pursuant to Fed.R.Civ.P. 60(b)(5) which provides:

> On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: ... (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, *or it is no longer equitable that the judgment should have prospective application.*

(Emphasis added).

### 1. Consent Decrees and the *Rufo* Standard

 The Attachment in question was negotiated and agreed upon by Debtor, the City of Cayce, and DHEC and was later incorporated by reference at the request of these parties in the Order of Confirmation of February 1, 1995. The Attachment specifically states that it was entered into for the purpose of resolving the objections by DHEC and the City of Cayce to Plan confirmation and specifies that its provisions only bind the parties to the agreement; therefore, it is best viewed as a consent decree.[3] Consent decrees are often regarded as " 'strange hybrid[s] in the

---

3. The Attachment states: "[It] affects only the parties to the Attachment and does not modify or affect in any way the classification or treatment of any other creditor, class of creditors or parties in interest."

law.'" *Lorain NAACP v. Lorain Bd. of Edu.,* 979 F.2d 1141, 1148 (6th Cir.1992) (quoting *Brown v. Neeb,* 644 F.2d 551, 557 (6th Cir.1981)). Not only are they considered voluntary settlements between parties which are fully enforceable, but they are also deemed to be "'final judicial order[s] plac[ing] the power and prestige of the court behind the compromise struck by the parties.'" *Id.* (quoting *Williams v. Vukovich,* 720 F.2d 909, 920 (6th Cir. 1983)). In other words, they are "'settlement agreement[s] subject to·continued judicial policing.'" *Id.·* (quoting *Vukovich,* 720 F.2d at 920); *United States v. Western Elec. Co.,* 46 F.3d 1198, 1205 (1995) ("A consent decree, in other words, is subject to modification to the same extent as if it had been entered as a final judgment after a full trial."). In *Alexander v. Britt,* 89 F.3d 194 (4th Cir.1996), the Fourth Circuit noted that consent orders are "'enforceable as a judicial decree' and [are] therefore subject to Rule 60(b) like other judgments and decrees." *Id.* at 199 (quoting *Rufo v. Inmates of Suffolk County Jail,* 502 U.S. 367, 378, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992)); *see also Roadtechs v. MJ Highway Tech., Ltd.,* 83 F.Supp.2d 677, 687 (E.D.Va.2000). Due to the Attachment's nature and its prospective effect in controlling the rates to be charged between the City of Cayce and Debtor,[4] at

least until December 31, 2004, and because the Plan has been performed in regards to other creditors; the Court finds that it is appropriate to view Debtor's request under the legal standard applicable to the modification of a consent decree.

 Pursuant to Fed.R.Civ.P. 60(b)(5), made applicable in bankruptcy proceedings by Fed.R.Bankr.P. 9024, a court may modify a consent decree for various reasons, including the fact that "it is no longer equitable that the judgment should have prospective application." Fed. R.Civ.P. 60(b)(5); *see also Small v. Hunt,* 98 F.3d 789, 795 (4th Cir.1996). Furthermore, Fed.R.Civ.P. 60(b)(6) provides that a party may obtain relief from a court's order for "any other reason justifying relief from operation of judgment." Fed. R.Civ.P. 60(b)(6).[5] Debtor argues that the proper standard to apply in determining whether modification of the Order of Confirmation, and more particularly the provisions in the Attachment, should be granted is the one established by the Supreme Court in *Rufo v. Inmates of Suffolk County Jail,* 502 U.S. 367, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992). The Court in *Rufo* rejected the view that Fed.R.Civ.P. 60(b) codified the standard established in *United States v. Swift & Co.,* 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932) that "[n]oth-

**4.** The evidence at the hearing indicated that utility rate contracts in the area are typically for a term of ten (10) years. If the parties cannot· agree to the terms of a contractual relationship, including the rates charged, DHEC often becomes involved, for health and environmental reasons, to ensure continuation of such services to the·public by joining the parties in state court litigation to determine and set reasonable contractual terms.

**5.** In its Order of May·2, 2000, the Court granted Debtor's Motion to Reopen Case "to allow the parties to present evidence and arguments as to·whether the facts warrant a modification of the Confirmation Order pursuant to Fed.R.Civ.P. 60(b)(5) or (b)(6)." However, neither Debtor nor the City of Cayce ever sought relief from the subject provisions of the Attachment pursuant to Fed. R.Civ.P. 60(b)(6). The parties' pleadings and arguments at trial, in fact, solely focused on

the request for relief pursuant to Fed.R.Civ.P. 60(b)(5). The Court finds it unnecessary to evaluate the two subsections separately. In the past, courts have evaluated similar requests to obtain relief from provisions in a consent decree, pursuant to Fed.R.Civ.P. 60(b)(5) and (b)(6), under the Supreme Court's standard set forth in *Rufo v. Inmates County Jail,* 502 U.S. 367, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992). Courts that have applied that test, have not evaluated the case in terms of the standards of the individual subsections of Fed.R.Civ.P. 60(b); rather, they applied the requirements set forth in *Rufo* to determine whether modification of the order in question was warranted. *See, e.g., Hadix v. Johnson,* 879 F.Supp. 743 (E.D.Mich.1995); *North State Law Enforcement Officers Ass'n v. Charlotte–Mecklenburg Police Dept.,* 862 F.Supp. 1445, 1447 (W.D.N.C.1994).

ing less than a clear showing of grievous wrong evoked by new and unforeseen conditions should lead [the court] to change what was decreed after years of litigation with the consent of all concerned." Rather, the Court in *Rufo* concluded that Fed. R.Civ.P. 60(b) "set a 'less stringent' ... standard intended to meet the 'need for flexibility in administering consent decrees.'" *United States v. Western Electric Co., Inc.,* 46 F.3d 1198, 1203 (1995) (quoting *Rufo,* 502 U.S. at 380, 112 S.Ct. 748). The Fourth Circuit has interpreted the Supreme Court's decision in *Rufo* as establishing a three-pronged test[6] to determine whether modification of a consent decree should be allowed:

> A party seeking modification has the burden of first "showing [that] a significant change either in factual conditions or in law" warrants revision of the decree. If the movant cites significantly changed factual conditions, it must *additionally* show that the changed conditions make compliance with the consent decree "more onerous," "unworkable," or "detrimental to the public interest."
> ...
> If the movant succeeds in demonstrating that a significant change in circum-

stance warrants modification of the decree, a court must then determine whether "the proposed modification is suitably tailored to the changed circumstance."

*Small v. Hunt,* 98 F.3d 789, 795 (4th Cir. 1996) (emphasis added) (citation omitted); *see also Thompson v. U.S. Dept. of Housing & Urban Dev.,* 220 F.3d 241, 247 (4th Cir.2000) (interpreting *Rufo* as a three-pronged test).

In its objection to Debtor's Motion, the City of Cayce argued that the standard set forth in *Rufo* is limited to prison reform and other public interest litigation and that a more stringent approach should be utilized in other cases, such as ones involving private parties.[7] Courts' decisions are split as to whether the holding in *Rufo* is limited to institutional reform litigation. Some courts appear to limit the standard for modification of consent decrees established in *Rufo* to institutional reform cases as opposed to commercial cases. *See, e.g., Small v. Hunt,* 98 F.3d 789, 795 (4th Cir. 1996); *Lorain NAACP v. Lorain Bd. of Edu.,* 979 F.2d 1141, 1148–49 (6th Cir. 1992); *Plyler v. Evatt,* 924 F.2d 1321, 1324

---

**6.** While the Fourth Circuit has interpreted *Rufo* as establishing a three-pronged standard, other courts are unclear as to whether a significant change of circumstances has to be established prior to moving to the other requirements. In *Lorain NAACP v. Lorain Bd. of Edu.,* 979 F.2d 1141 (6th Cir.1992), the court stated:

> Under the relaxed standard, modification of an institutional consent decree
> may be warranted when changed factual conditions make compliance with the decree substantially more onerous ... when a decree proves to be unworkable because of unforeseen obstacles ... or when enforcement of the decree without modification would be detrimental to the public interest.

*Id.* at 1149; *see also Hadix v. Johnson,* 879 F.Supp. 743 (E.D.Mich.1995) ("Defendants may meet their initial burden by showing a significant change in either factual conditions or in the law which makes compliance with the Decree substantially more onerous. Modification of the Decree is also appropriate if defendants show that the Decree is unworkable because of unforeseen obstacles or when

enforcement of the Decree without modification would be detrimental to the public interest."). Despite the interpretation in other jurisdictions, this Court follows this Circuit's precedent in interpreting the standard in *Rufo* as a three-pronged test, which requires that the movant initially establish a significant change in circumstances prior to considering the other factors.

**7.** The standard that some courts have applied in cases dealing with modification in consent decrees in a non-institutional reform situation is stricter than the *Rufo* test. Despite the fact that precedent on such factual situations is scarce, the case law on the issue seems to indicate the stricter standard requires a showing that the movant would sustain an extreme and unexpected hardship if the order were not modified. *See, e.g., W.L. Gore & Assoc., Inc. v. C. R. Bard, Inc.,* 977 F.2d 558, 561 (Fed.Cir.1992); *see also Roadtechs, Inc. v. MJ Highway Technology, Ltd.,* 83 F.Supp.2d 677 (E.D.Va.2000).

(4th Cir.1991); *W.L. Gore & Assoc., Inc. v. Bard,* 977 F.2d 558, 562 (Fed.Cir.1992).[8]

Cases reaching a conclusion on the opposing end of the spectrum have interpreted *Rufo* as giving the *Swift* decision the "coup de grace" and have concluded that "although [*Rufo*], like the lower-court cases that had expressed dissatisfaction with the standard of *Swift*, involved institutional reform litigation, the 'flexible standard' adopted in *Rufo* is no less suitable to other types of equitable cases." *Hendrix v. Page (In re Hendrix),* 986 F.2d 195, 198 (7th Cir.1993) (affirming modification of bankruptcy discharge); *see also Patterson v. Newspaper & Mail Deliverers' Union,* 13 F.3d 33, 38 (2d Cir.1993); *Building & Constr. Trade Council v. NLRB,* 64 F.3d 880, 887 (3d Cir.1995); *NLRB v. Harris Teeter Supermarkets,* 215 F.3d 32, 35 (2000); *United States v. Western Electric Co.,* 46 F.3d 1198, 1203 (D.D.C.1995).

Without concluding that the *Rufo* standard is ultimately the correct standard to apply in the case presently at issue, this Court is inclined to consider Debtor's request to modify the Order of Confirmation under the standard which is most favorable to its arguments. Therefore, for purposes of this analysis, the Court shall view *Rufo* as applicable in non-institutional cases such as the one presently before the Court.

## 2. Application of Standard

■ Although the standard that the Supreme Court established in *Rufo* to determine whether the modification of a con-

sent decree should be granted is considered a "flexible" standard in comparison to other tests that have been applied by courts in making such a determination, the Supreme Court stated that "it does not follow that a modification will be warranted in all circumstances." *Rufo v. Inmates of Suffolk County Jail,* 502 U.S. 367, 383, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992). The modification of a consent decree should be granted only when the moving party meets his or her burden to prove that "a significant change in facts or law warrants revision of the decree and that the proposed modification is suitably tailored to the changed circumstance." *Id.* at 393, 112 S.Ct. 748. The movant does not meet this burden by simply arguing to the court that "it is no longer convenient to live with [the decree's] terms.'" *Thompson v. U.S. Dept. of Housing & Urban Dev.,* 220 F.3d 241, 247 (4th Cir.2000) (quoting *Rufo,* 502 U.S. at 383, 112 S.Ct. 748). Furthermore, the movant may not rely on "events that actually were anticipated at the time it entered into [the] decree" in requesting a modification. *Rufo,* 502 U.S. at 385, 112 S.Ct. 748.

■ For the reasons stated below, the Court finds that Debtor failed to meet its burden to prove a significant change in circumstances that would warrant modification of the Order of Confirmation. In its Motion, Debtor argues that the City of Cayce's entry into two other wholesale contracts on terms which set more favorable rates than the one that the City of Cayce presently charges Debtor consti-

---

8. Precedent in this circuit has also drawn that distinction. In *Small v. Hunt,* 98 F.3d 789 (4th Cir.1996), the court noted that "'the unique nature and demands of institutional reform litigation necessitate a more flexible approach to modification' than may be appropriate with respect to consent decrees between private parties.'" *Id.* at 795 (quoting *Plyler v. Evatt,* 924 F.2d 1321, 1324 (4th Cir. 1991)) ("The 'uniqueness' of [such] litigation lies in the fact that it is necessarily aimed at achieving 'broad public policy objectives in a complex, ongoing fact situation,' with the consequence that consent decrees settling

such litigation must be viewed as embodying 'not so much peremptory commands to be obeyed [but] as … future-oriented plans designed to achieve [those] objectives.'"). However, all these cases seem to indicate that a less stringent standard for modification of consent decrees applies in cases in which the provisions which are the subject of the modification request affect more than the rights of the immediate litigants involved and present a higher likelihood of significant changes due to their longer duration. *See, e.g. United States v. Western Electric Co.,* 46 F.3d 1198, 1203 (1995).

tutes a sufficient factual change of circumstance. Debtor claims that these subsequent contracts have created a strong basis for Debtor to presently seek similar terms for its wholesale treatment contracts. In this Court's view, such a change is not the type that was contemplated by the Supreme Court in *Rufo*.

At the time the Attachment was voluntarily entered into, all parties were represented by capable, experienced lawyers; who, along with their clients, negotiated the terms expressed in the Attachment's provisions, thus resolving the outstanding objections of DHEC and the City of Cayce to Debtor's Chapter 11 Plan. The Attachment effectively set the rates to be paid by Debtor to the City of Cayce for a ten (10) year term, which is, according to the evidence presented at the trial, the typical term of such utility agreements outside of a bankruptcy context. Even though, at the time of the subject Attachment, Debtor may have been unaware of the alleged more favorable rates that the City of Cayce was to charge pursuant to the Lexington Contracts,[9] it could have reasonably anticipated the possibility that, in an industry where utility services by smaller private providers are being consolidated into larger treatment facilities, the City of Cayce would enter into other contracts providing for different terms and, possibly, lower rates. In this case, Debtor agreed

to the provisions in the Attachment specifying the rate to be charged for the City of Cayce's services because, much like a private sector contract, it seemed to be the most favorable terms at the time. The Court is not aware that utility service contracts are avoidable outside of the bankruptcy context simply because another party has entered into a contract on more favorable terms. In this case, the Court is not inclined to grant the modification of the contractual terms set forth in the Attachment on the grounds that the City of Cayce later offered more favorable rates to other entities, especially where no other evidence has been introduced showing a change in the specific relationship between Debtor and the City of Cayce.[10] In other words, no significant change between the parties to the consent decree has been shown that warrants revision of the Attachment.

The Court further notes that the City of Cayce has offered a plausible explanation for the difference in rates being charged to Debtor and the other two entities that contracted with the City of Cayce following the entry of the Order of Confirmation. While the Lexington Contracts involve the sale of large volumes of capacity, the agreement between Debtor and the City of Cayce establishes a usage rate for Debtor as a customer of Cayce. Prior to 1995, the City of Cayce used to sell sewer taps to its

9. As the court in *United States v. Western Electric Co.*, 46 F.3d 1198 (1995) has noted:
 Rule 60(b)(5) does not foreclose modifications based on developments that, in hindsight, were things that "could" happen. If the rule were so restricted, it would never be successfully invoked: whatever actually occurs after entry of the decree is necessarily something that could have occurred. The focus of Rule 60(b)(5) is not on what was possible, but on what the parties and the court reasonably anticipated.
 *Id.* at 1205.

10. For instance, Debtor has not introduced any evidence to prove that the provisions of the Attachment presently have had a substantially detrimental impact on its financial conditions. Debtor, being in a regulated industry with a captive customer base, has not lost

business as a result of its customer's comparison of its rates to other entities' rates. Debtor is further protected from such a consequence because it is generally the responsibility of the State regulatory authority to set Debtor's allowed charges to the public at a rate which ensures sufficient operating margin and a reasonable profit. Given the fact that "[t]he determination of a fair operating margin is peculiarly within the province of the PSC," Debtor should raise its concern to the PSC to ensure sufficient operating margins and profits. *Hamm v. South Carolina Pub. Serv. Comm.*, 309 S.C. 295, 422 S.E.2d 118, 122 (1992). However, there has been no showing in this case that Debtor has recently tried to appear before the PSC to address its concerns and to request a higher operating margin.

customers. In 1987 and 1988, Debtor purchased sewer taps from the City of Cayce which would later be resold to its customers for wastewater treatment. Debtor financed the purchase through the City of Cayce and that debt was paid off through the Chapter 11 Plan. In 1995, however, the City of Cayce ceased selling sewer taps and began selling "capacity," which is dealt with in units. For large users, the right to purchase capacity consists of a negotiated agreement subject to approval by the City Council of Cayce, whereby the customer pays a capacity fee in a lump sum, and a formula is then used to calculate the monthly usage charge. Such is the nature of the Lexington Contracts. Those contracts, unlike the contract between Debtor and the City of Cayce, impose other obligations on the customers beside the payment of the fees and capacity costs. In fact, they include provisions obligating the customer to make a capital contribution for improvement of the facility, as may be required by regulation. Thus, the Lexington Contracts, which are viewed by Debtor as having caused a significant change of circumstances, are different that the agreement between Debtor and the City of Cayce. Taking into account the differences in the Lexington Contracts with the contract which is the subject of this Motion as well as the variables which affect the rates to be charged to different entities by the City of Cayce; the Court notes that, even if it were to set aside the provisions in the Attachment which are at issue in this case, Debtor would not be certain to receive a rate comparable or better than the rates the City of Cayce charges other entities.

 The Court thus concludes that Debtor has not established a substantial change of circumstances that warrants the modification of the Attachment. While Debtor's failure to meet the initial prong of the *Rufo* standard eliminates the need for further analysis, the Court will nevertheless address the remaining prongs of the test. The second prong of the *Rufo* test requires a determination that the change in circumstances makes compliance with the decree to be "more onerous," "unworkable", or "detrimental to the public interest." *Small v. Hunt,* 98 F.3d 789, 795 (4th Cir.1996); *see also Thompson v. U.S. Dept. of Housing & Urban Dev.,* 220 F.3d 241, 247 (4th Cir.2000).

While the Court recognizes that Debtor performs in an area which is a "regulatory morass," no evidence was introduced that continued compliance by the parties with provisions in the Attachment was either unworkable or substantially more onerous or one that currently creates an extreme burden on Debtor. Essentially, Debtor's argument focuses on the fact that, because contracts providing more favorable rates have been entered into since the Attachment was executed, it should be charged the same. This Court finds that such a circumstance does not suffice to meet these requirements of the *Rufo* standard. *Thompson v. U.S. Dept. of Housing & Urban Dev.,* 220 F.3d 241, 247 (4th Cir. 2000) (quoting *Rufo,* 502 U.S. at 383, 112 S.Ct. 748).

The Court has also given serious consideration to Debtor's argument that the continued enforcement of the decree without modification would be detrimental to the public's interest. Debtor argues that the City of Cayce's "discriminatory" rates will result in unfair high rates to Debtor's customers, thus impacting the overall public interest. Debtor asserts that, being a public utility, the rates it charges its customers are regulated by the PSC.[11] Ac-

---

11. The PSC does not set the rate that the City of Cayce charges Debtor; rather, its duty is to control the rates which a provider charges the public and, in turn, ensure that when taking into consideration the rates charged and the utility's expenses, the formula allows for a reasonable operating margin. Thus, the rates that Debtor charges the public is a matter of contract in which the State Court system may become involved if and when the parties, who are required to work together to serve the public, cannot reach an agreement on the terms of their contract.

cording to the evidence, the PSC acts not only to ensure that the rates which a provider charges the public are reasonable but also to ensure that the rates charged produce sufficient income and profit, thus providing for a reasonable operating margin.[12] According to Debtor's argument, because Debtor must operate at a fair operating margin, the higher the rates it pays to the City of Cayce for its wastewater treatment services, the higher the rates charged to Debtor's customers. This, in turns, causes the customers to complain to the PSC and pressures the PSC to tighten Debtor's operating margins. While the Court understands these concerns, the Court recognizes that utility rates across this State are not uniform; rather, they depend on various factors, including the different rates agreed to between the utility company and treatment provider. It is the PSC's responsibility and not the usual province of this Court to balance the needs of the public with the needs of the utility on the setting of rates. This Court is reluctant to assume such a role, particularly when the interests of the public were not a primary issue before the Court, or even an apparent consideration among the parties, at the time the Attachment was executed and the Order of Confirmation was entered. Had Debtor been joined by the PSC or DHEC in its Motion, it may have been more appropriate for this Court to act in regards to the public interest.

Furthermore, it is not clear that the interests of the group of customers serviced by Debtor is the type of "public interest" contemplated by the Supreme Court in *Rufo*. Debtor's customers are a specific, defined group whose utility service is controlled by their geographic location. Their interest in having similar water and sewer rates with their neighbors may not be sufficiently broad enough to evoke the *Rufo* standard and is not be the kind of public policy issue that was contemplated by the Supreme Court in *Rufo*.

Finally, the Court notes that evidence is not clear that the public would necessarily benefit if the requested relief were granted. In fact, the testimony at the hearing indicated that any reduction in rates charged to Debtor for services provided by the City of Cayce would not necessarily correlate with an equivalent reduction of rates to the public.[13]

From the foregoing arguments, the Court concludes that Debtor has failed to meet its difficult burden under the *Rufo* standard in order to modify the consent decree at issue. It is therefore,

**ORDERED** that Debtor's Motion to Amend Order of Confirmation Pursuant to Bankruptcy Rule 9024 is denied.

**AND IT IS SO ORDERED.**

---

12. The operating margin set by the PSC constitutes the difference between a utility's allowed expenses and the revenues raised by the rates it is allowed to charge. *See Hamm v. South Carolina Pub. Serv. Comm.*, 309 S.C. 295, 422 S.E.2d 118, 122 (1992).

13. Due to the fact that the first two and most significant prongs of the *Rufo* standard have not been met, the Court deems it unnecessary to address the third prong, dealing with whether the proposed modification of the decree is tailored to the changed circumstances.